All right, I'll call the case then. This is a case of Wilcox v. Advocate Condella, 123-0355. The justices involved are Mary Ellen Coghlan, Justice Aurelia Puczynski, and myself, Justice James Fitzgerald Smith. We've given you additional time. I would just point out, there is one thing you may wish to make a reference to, if I can find the section. Well, I'm not finding it right now, but it's the one that talks about what happens if we rule on one of the two PCs and not on the other. And that's section 1209A-D. Anyway, I just, if you want to add a reference to that at the end of your comments, that's fine. If you don't, you don't. Our procedure is the appellant goes first and gets the standard, although longer this time amount of time. And then we ask questions, and then the appellee gets their opportunity to respond, and we ask questions, and then the closing. With that in mind, the appellant may start. Your Honor, if I could interrupt. You said 1209. Is it 1209 or 1201? Well, what is it? I can't. It's the one that says that we should rule for one of, but not both of the cases you have. Got it. Approximate cause. If I can come across that my notes are all over here, because I was spending so much time on the prior case. I'm sorry to interrupt. I'll be quiet. Okay, it's 735 ILC 5-2-1201, and then it's A-D. So I'm saying when you're done, if you wish to make a comment on that, we're pleased to hear it. With that, the appellant may start. Good afternoon, Presiding Justice, and may it please the Court. Again, John Amarillo for Defendant Advocate Condell Medical Center. First, I'd like to thank the Court for granting the party's additional time to discuss this case here with you today, because I think it speaks to a joint understanding that this case deserves your close attention. There's no doubt that this is a tragic case. I'm not here to debate that. The question is whether the blame for that tragedy can be put upon advocate, and the answer to that question is no. If I may, I'd like to begin with the institutional negligence issue, one, because I believe it's easily answered. And two, perhaps going to what you were just referencing before, Justice Fitzgerald-Smith, doing so cuts the work that the Court needs to do on the approximate cause issue in half. Let's be very clear about what the plaintiff is trying to do in this case. They're trying to make new law. They're trying to significantly expand what institutional negligence is. The touchstone of that claim has always been an administrative or managerial failure by the hospital that led to a plaintiff's injury, and there's generally been three recognized ways to prove that kind of claim. The first is a negligent credentialing claim. That's not at issue here. Plaintiffs didn't bring a negligent credentialing claim. The second is a claim based on the idea that the hospital didn't have proper policies and procedures in place. That's not at issue here. Even plaintiffs' expert on institutional negligence, Dr. Petra Faisa, said that the hospital's policies and procedures were all above board. That brings us to the third way you could prove institutional negligence, and that's the failure to enforce adequate policies and procedures. That's plaintiff's case here. Now, to prevail on a claim like that, a plaintiff must show that the hospital knew or should have known that its policies weren't being followed, and it failed to take adequate corrective action. How do we know that? Well, because this court has said it numerous times in Essig, in Reynolds, in Johnson, in Rowe, and others, and the Supreme Court also said it in the Darling case when it first recognized institutional negligence in Illinois. It said that it was applying ordinary negligence principles to hospitals. Well, ordinary negligence principles obviously include reasonable foreseeability. That's notice. Now, this isn't just a logical inference on my part. The Supreme Court said it in Darling all those years ago when it was discussing whether government regulations and industry standards could be considered when the jury was weighing standard of care and breach. It said, yes, juries can consider that kind of information because it's going to aid them in determining what was feasible and what the hospital knew or should have known. Now, why would the court say that unless it was also saying that notice is an inherent part of any institutional negligence claim? Without notice in a failure to enforce case like this, all you're doing is holding a hospital strictly liable for the professional negligence of its treaters. There's another name for that, vicarious liability. Now, plaintiff has no evidence, none of prior failings by treaters to follow hospital policies or procedures that the hospital knew or should have known about, not from this patient, not from any other patient. The plaintiff also has no cases, none, supporting the idea that they ask you to adopt here, which is that notice is somehow not required in this new special subset of institutional negligence cases where more than one treater is alleged to have been negligent. Where is the case endorsing that kind of theory? It's certainly not in their response brief. That's why I say plaintiff is trying to make new law. They're arguing for a new kind of institutional negligence. One based on this really amorphous idea of a systems failure defined simply as more than one treater violating the hospital's policies and procedures. It's an entirely circular argument. If I can give you an example, the plaintiff's counsel said this at the jury instruction conference. The trial court asked counsel directly, what's your proof? What's your proof that the hospital failed to enforce its policies and procedures? Do you know how counsel answered? He said the fact that they didn't do it. That is the definition of a circular argument. When I was preparing yesterday, I flipped through my copy of Logic for Lawyers. A friend and a mentor, who may or may not be arguing against me today, gave me this book. And I flipped to the section discussing logical fallacies, specifically logical fallacy of begging the question. And they give this great example. And if you'll indulge me, I think it helps make the point a little bit. It comes from an old George Burns and Gracie Allen skit when they had a radio show. And Gracie says, gentlemen prefer blondes. George says, well, how do you know that? And Gracie says, a gentleman told me so. And George says, how do you know he was a gentleman? And Gracie says, because he preferred blondes. That pattern of argument follows exactly like this pattern of argument here on institutional negligence to a T. You can't assume the truth of a premise to prove its conclusion. You can't just point to the outcome to prove the cause. But that is plaintiff's entire institutional negligence case here. Now, I was taught to show, not just say. So if you'll let me, let's look at Dr. Peterface's testimony, because his testimony is really a sum and substance of their institutional negligence claim. First, I would urge the court, please read his testimony in full. There's not much there in length or in substance. It won't take you long, and it won't take you very long at all to see that there's nothing behind his opinions. Dr. Peterface opined that there was a systems failure to find, and these are his words, this isn't me being glib, when many things go wrong. That was his definition of a systems failure, when many things go wrong. That is so vague, it is completely meaningless. Now, if we look at his individual criticisms, and I've condensed them a little bit because he was really redundant, but I think they can be condensed into seven criticisms. The first is that the nurses violated hospital policies, requiring them to report Scott's condition of unrelieved pain to physicians, and by not reporting changes in his condition to the physicians. That's criticizing the nurses. That's not criticizing the hospital. Now, Dr. Peterface has said the advocate had an obligation to ensure that its policies and procedures were being followed. We agree with that. The problem is that to support the conclusion that the hospital wasn't doing that, Dr. Peterface only pointed to the allegations that the nurses weren't doing that. And as we all know, your honors, an expert's opinion is only as valid as the facts underneath it, and there are none here, other than facts pointing to vicarious liability. His second criticism was that the nurses supposedly ignored Jim Wilcox's repeated statements that they wanted this baclofen replacement pump surgery done as quickly as possible. That's criticizing the nurses, not the hospital. His third criticism was that advocate didn't coordinate efforts between treaters. Now, this is a failure to supervise allegation, but advocate did have rules and regulations, policies, and procedures in place requiring that kind of coordination, and Dr. Peterface has said all of those were above board again. But the uncontradicted testimony was that it was Dr. Chu Wang's responsibility as the admitting physician, as the hospitalist, to coordinate Scott's care. So that's a criticism of him as a treater, not of the hospital. The next criticism was that advocate's treaters were unqualified to treat baclofen withdrawal. That's just a pot shot because they didn't have a negligent credentialing claim. There's nothing behind that criticism. His next criticism was that the OR nurses and the pharmacists, plaintiff was never really clear which, didn't timely place the order for the correct concentration of baclofen. That's criticizing the nurses. That's criticizing the pharmacists, not the hospital. His sixth criticism was perhaps his most telling, and this is in plaintiff's words, I'll quote them to be fair. The hospital itself is responsible for violation of these standards. Well, when those standards are violated by treaters, by caregivers, and the hospital doesn't know or the hospital has no reason to know that those violations are occurring, that's vicarious liability. That's not institutional negligence. His last criticism was that advocate erred by not incorporating Dr. Seno's facts with the recommended baclofen concentration into his medical record. I found that one pretty confusing. I still do because plaintiff's counsel said during his opening statement that the facts did make it into Scott's medical record. Then during closing statements, he said it was unclear. Still, I think that's a very odd statement to make in closing because it's obviously his burden to prove. Even so, if we assume the facts didn't make it into Scott's medical record, the plaintiff introduced no evidence that advocate knew or should have known about that fact. So, again, there's a fatal notice problem here with that criticism. If you step back and look at all these criticisms in the aggregate, I think what you'll see is that Dr. Petrafeza is criticizing the treaters and caregivers. He's not criticizing the hospital. Now, during his testimony at several points, he said, oh, I'm criticizing the hospital here. I'm not criticizing the treaters. Well, he did that because the trial court ordered plaintiff's counsel to make him say that. But what he was doing was he was actually criticizing the treaters, and he can't change that fact. When he said otherwise, all he was doing was gaslighting the jury. This is why I think at the jury instruction conference, the trial court told the plaintiff of their institutional negligence claim, quote, you haven't linked up the negligence in action by the hospital. You haven't linked it up. The court described that same claim as ephemeral, and it said, she said, the trial court said that she listened to Dr. Petrafeza's testimony carefully. And when he was done and leaving the stand, she thought to herself, this is it? Yeah, this is it. Because there's nothing there. Now, plaintiffs said in their response brief that the Essig case, the Reynolds case, the Johnson case, the Roe case, all that authority that we cited, that doesn't apply and notice isn't required because those cases don't control. Because this isn't a negligence supervision case. Well, first of all, failure supervises self-evidently a subset of a failure to enforce case. So that argument doesn't fly. Second, that's a tacit admission, as I read it, that if this is a failure to supervise case, well, then those cases do control. Let's look at their brief. At page 35, plaintiff says her institutional negligence claim, quote, does not charge advocate with improperly supervising physician's medical judgments. Okay. Turn the brief four pages. That's all you have to do to page 39. Plaintiff argues that her claim is based on the hospital's, quote, negligent supervision and evaluation of Scott's treaters and caregivers. That must mean, according to plaintiff's own argument, that Essig, Reynolds, Johnson, Roe, they all control and they do not have an institutional negligence claim here. Plaintiff also argues that advocate knew or should have known about Dr. Seno's fax. Look at her citations for that proposition. Look at her citations throughout her brief. I urge you. But if you look at her citations for that proposition, you're going to see that all she cites is Dr. Seno's testimony that the fax was sent and Dr. Hallett, the ER physician's testimony, that it appeared from the type print on the top of the record that the fax was received. There's no evidence, much less a citation, demonstrating that the hospital knew or should have known that the fax wasn't timely scanned into Scott's medical record, assuming that's what happened. So there's a fatal notice problem with this as well. That brings us to proximate cause, and there's two aspects to this issue, which I think you alluded to before, Justice Smith. The first is plaintiff's vicarious liability claim based on the alleged negligence of nurse's tenant and the owner. The second is plaintiff's institutional negligence claim against the hospital based on this amorphous idea of a systems failure and communications failure. Now, I'd like to focus on the nursing claim first, because if you agree with us on the institutional negligence claim, then you don't have to examine the proximate cause issue as it relates to institutional negligence, only as it relates to the vicarious liability claim concerning the nurses. Dr. Bagen showed that there's no link between the nurses' alleged negligence and the plaintiff's injury. He testified very clearly, I think, that even if the nurses had proactively reached out to him Sunday evening, later Sunday night, and told him about Scott's condition, it would not have affected his decision making. He still would have waited until Monday morning to order the surgery, which means he still would have waited until then to submit the pick list, and it still would have been an add-on surgery, which means the back wouldn't have been ordered any earlier than it was. It couldn't have been because the conditions weren't there for it to have been ordered any earlier. We know this, not only because of his testimony, but because of the testimony of Advocate's Chief Pharmacist, Sheila Grasso. Her unrebutted testimony was that the hospital procedures provided that she needed Dr. Bagen's order before she could begin fulfilling that prescription. Remember, too, Dr. Bagen personally examined Scott on Monday morning and determined that he was stable, and determined that he wasn't going to do anything that deviated from his plan, and then testified later that no matter what the nurses said, it wasn't going to change his mind. The mind that he made up around midnight on Sunday and again Monday morning. That's why the Supreme Court's decisions in cases like Gill and Snelson are on all four with this case. Those cases say that where a nurse fails to communicate information to a treating physician, but that information is already available or known to the physician, the nurse's failure can't be linked to the patient's injury for purposes of proximate cause. So, Playa's argument here really depends on this factually unsupported assumption that if the nurses had proactively called Dr. Bagen, then that higher 2,000 microgram concentration of Baclobin would have been ready for surgery earlier on Monday. There is no evidence supporting that. That is pure speculation. Dr. Bagen never said that. Sheila Grasso, the pharmacist, never said that. In fact, if you look closely at Ms. Grasso's testimony, I think what you'll find is that she specifically rejected Plaintiff's attempts to imply that this process started when the pharmacy ambiguously was notified of the need for the medication. She said, no, I need the direct order from the doctor. Now, Plaintiff was trying to get her to be vague on that point because they were trying to link up the idea that Grasso could have, or one of the OR nurses, I suppose, should have looked at Scott's medical file, and there discovered Dr. Seno's facts recommending the 2,000 microgram concentration of Baclobin. But Dr. Seno had no power to order medication and advocate. Neither did any of the OR nurses. They were mere intermediaries. It all came back to Dr. Bagen. He had that power. Now, when Dr. Bagen was asked the same question five times by Plaintiff's counsel on this point at trial, he said, perhaps, maybe, if the nurses spoke to him earlier on Sunday, he may have, quote, started the process of trying to plan the case earlier. But he immediately clarified that that wouldn't have changed the timing of the surgery, which means it wouldn't have changed the time he sent up the pick list, which means the Baclobin would not have gotten there any earlier than it did. What this starting the process line that Plaintiff hangs their entire argument on means, we don't exactly know because Plaintiff's counsel never asked, probably because they knew they wouldn't have liked the answer. I don't think it's any accident that Plaintiff asked Dr. Bagen the same question five times. They knew this was the crux of their case. And the most they could get from him was this mealy-mouthed non-answer and conjecture. The only reasonable inference for what that phrase means, starting the process earlier, I think the only reasonable inference is that it meant he would have entered the NPO order, that's the nothing by mouth, you know, no food or drink order, a little earlier, and maybe would have ordered the CT scan earlier. Because those are the steps that come before ordering a surgery. But that whole discussion was had in terms of the orders. There's only three orders that were discussed, the NPO order, the CT scan order, and the surgery order. And Dr. Bagen said time and time again he would not have entered the surgery order any earlier than he did on Monday. Now, Plaintiff, despite this, just keeps saying throughout their brief that it means the baclofen would have been ordered earlier. But no one with knowledge testified to that, Your Honors. It's pure speculation. All we know from the evidence is that starting the process earlier doesn't mean ordering the surgery earlier, which means it doesn't mean submitting the PIC list earlier, which means it doesn't mean obtaining the baclofen any earlier. That's what we know from the evidence. That's what the facts show. When you're considering this, I invite you to entertain a counterfactual. If you look at the world the way Plaintiff would have it in this case, where the treating surgeon, Dr. Bagen, isn't in total control of what medication makes it to DOR, and you have OR nurses or pharmacists flipping through medical records, guessing at what they need, based on perhaps even recommendations from other physicians, even without privileges like Dr. Seno, that is a recipe for chaos. There is a reason there's a hierarchy at the hospital for this kind of process, a hierarchy that even Dr. Petrofeffa did not criticize. If that kind of chaos prevailed, if you had nurses and pharmacists guessing as to what a surgeon needed in the neurosurgery, that's a recipe for actual and I think frequent negligence. Keep in mind also that Plaintiff never called a neurosurgery expert to counter Dr. Bagen and potentially create a question of fact as to what a reasonable neurosurgeon would have done in these circumstances. And because of that, if you look at the Snelson decision, the Supreme Court said in this circumstance, where that happens or rather where it doesn't happen, there's no question of fact for a jury to decide. That brings me to the last point I'd like to make. And then I'd like to reserve the balance of my time for rebuttal, which is the approximate cause as it relates to the institutional negligence claim, or rather the lack thereof. Now, this boils down to a timing issue, specifically whether it was advocate's fault that that high concentration of baclofen didn't arrive between 245 or didn't arrive by 245 p.m. on Monday, which was the last possible time, according to plaintiff's expert, that Scott could have received the baclofen and been without any permanent injury. Now, Dr. Bagen's unrebutted testimony, and I just have to emphasize again, his unrebutted testimony was that he exercised his own medical judgment in deciding when to perform the surgery. And nothing, nothing in advocate's policies and procedures directed the manner and method of his treatment. He decided to wait until Monday morning to order the surgery. He decided not to see Scott when he first arrived at the hospital on Monday morning. He decided to classify the procedure as an add-on, giving this surgery the lowest possible priority at the hospital. Scheduled cosmetic surgeries would have come before Scott because of Dr. Bagen's order and his evaluation. Dr. Bagen failed to list the needed baclofen concentration on the PIC list. Yes, he said he needed baclofen, but he didn't say what concentration of baclofen was required. And keep in mind, advocate carried the very commonly used 500-microgram concentration of baclofen. The 2,000 concentration, that's used maybe once a year, so it's very rare. When a nurse is looking at that, what reason would he or she think to have, oh, this is that one time of year where we need the 2,000-microgram concentration? It was Dr. Bagen who failed to inform the OR staff and the pharmacy that he needed that specific concentration. And he never changed the status of the procedure, even at 1.30 in the afternoon when they told him they don't have the needed baclofen. He didn't say to anyone, could you hurry up, or I need that stat, or this is an emergency. He just said, okay, 3.30 is fine. 3.30 wasn't fine, according to Plano's own expert, but he thought it was. And, of course, he never informed anyone at the hospital, not just the OR staff, not just the pharmacist. He never informed anyone that there were any time pressures involved in this surgery. Now, Justice Fitzgerald-Smith, if I may, when you were referencing Section 1201B, I assume that you're asking about the general verdict rule? Is that what you're getting at? Okay. I don't think that there's any possible application of the general verdict rule here. If anyone thought that, or even Mike thought that, I think it would have been prominently placed in his brief. The verdict here broke down the negligence allegations, so it was essentially a special verdict. There's no general verdict here. Also, advocates submitted a number of special interrogatories that were proper informed that the trial court rejected. So I think it would be pretty unfair to hang that around the hospital's neck now. Even so, the general verdict rule requires one good count, and we don't have that here. We have two counts, an institutional negligence claim that was not proved because it is not an institutional negligence claim, and a vicarious liability claim that suffers fatally from a lack of proving proximate causation. So there's no general verdict rule problem here, in my opinion. I'd like to invite the court's questions. Otherwise, I'll reserve the remainder of my time. My first question to you is, and it's kind of interesting, you indicate that the doctor could make the timeframe of his operation, which in effect tells me you've admitted that the hospital had no procedure in place for scheduling these operations. Now, I only point that out because in my 25 years dealing with cystic fibrosis with my daughter, who I have to say had wonderful treatment at every hospital she was in, which was not this one, and included Lothern, which did Horner's for her, and probably the best being the University of Iowa, which has in place procedures for every operation. In other words, they have a pick list for every operation. And in this case, if I'm wrong, you can tell me, but if I recall, the doctors on Friday evening informed the emergency room and both the nurse and a doctor of the facts that they needed the 2,000 milligrams, or whatever number that is. And he also faxed it. And further, as I go through this case, I see that it was scanned into the medical records, at least on three occasions, and that they were reminded of this every day through one way or another. So I guess I'm not buying your institutional argument, because it is the hospital that had a culture here, who failed to have a notice in effect for varying things, such as their teaching policies are totally inadequate. They could see the nurses were not taught properly here. Not only were they not taught, but just in the one case where it's a rogue, they didn't even pass on to each other the procedure. She just left. In most hospitals, in every hospital I was in, they had at minimum a half an hour overlap of training and instructing on what was said and done. So you've got that, you've got no communications exemplified here. So when you say they didn't have notice, that's malarkey. They had notice because there was a culture here, a clear culture that they did not follow a pattern. And it wouldn't be just this one case. It would be a pattern over, I'd say, years. You couldn't just have one case screw up this badly. You had to have a pattern. And the fact that the doctors didn't even communicate, the doctors and nurses didn't communicate. How can you say that there wasn't a pattern and a lack of notice over four days? Four days it wasn't reiterated? I don't know what to tell you. I've never seen anything in the 25 years I watched hospitals operate, whether it was University of Iowa, whether it was Loyola, whether it was Northeastern, whether it was Children's, whether it was Lutheran, which is an advocate hospital. They all had in place structures to cross check and supervision, even to the point that each doctor who was operating had to report what and when he was going to do it. Not just daily, but from the very first time he was told he was going to perform. I know that doesn't sound like much of a question, but it sums up everything I saw that was wrong with this case. I'm sorry, but I just had to say it. No, and I appreciate that, Your Honor. There's a lot there, so I'll do my best to unpack it. Your first point was that there were no procedures in place for scheduling surgeries at this hospital. That's incorrect. There were procedures in place, and the evidence was quite detailed on that. Emergency procedures have first priority for scheduling, then urgent procedures, then pre-scheduled elective procedures, and lastly, this category that Dr. Bagan put Scott's procedure in, an add-on. It's essentially like flying standby. If there's time at the end of the day after all the other scheduled surgeries and emergency surgeries have gone forward, we'll get this case in, and that's important to understand. There absolutely was a procedure here and a policy, a procedure and a policy that their institutional negligence expert didn't criticize, and he said was perfectly acceptable. So, Your Honor, respectfully, that's simply wrong when you say that the hospital did not have a procedure in place for scheduling surgeries. With regard to Dr. Seno's facts that was scanned into the record, I'm glad you agree that the evidence showed that it was. The plaintiff's counsel kept going back and forth during trial on whether that was the case, but keep in mind, Dr. Seno did not have the power to order medication at Advocate, so that was just a recommendation that he was making to Dr. Bagan. Dr. Bagan talked about this in his testimony. Dr. Bagan was the only one who could actually order that medication. What else is supposed to happen? The nurses are supposed to flip through the file and guess. Oh, well, we have this other treater from outside the hospital who doesn't have privileges here, and he recommends this concentration, so we'll act on that rather than what the surgeon is telling us or not telling us. That is a recipe for chaos, sir. You asked what evidence was there that the hospital, well, you were talking about the nurses failings, the lack of training. What evidence is there that the hospital had noticed that there were any deficiencies in its training? None. There's no evidence of that anywhere in this record. And you said it was malarkey and that there was a cultural problem here. Respectfully, Your Honor, you're walking right into the logical fallacy that the plaintiff set up for you here. You're assuming the premise to get to the conclusion. That's the whole Gracie Allen, George Byrne skit. That's why I did that, to emphasize the point. Also, just because I'm a fan. And you said there would be, I think this is a great point that you're making, Judge, but it cuts the other way. You said that there would be a pattern over years because these problems are so pervasive. If that's the case, if there was a problem and there was a pattern, why didn't plaintiffs show it? Why didn't they introduce one piece of evidence anywhere showing that this happened in a prior case? They didn't. And that goes to the notice issue. So while I understand everything you're saying, respectfully, Your Honor, it's wrong. And it's disproved by the record here. Any other questions? I have a question. When Dr. Kim Karsimis wanted to contact Brooke Hansel, was she required to contact Dr. Chiney by using PerfectServe or could she have just picked up the phone? If I recall correctly, they had the option. There were multiple methods of communication there. And if I can anticipate where I think your point is going, Justice Buczynski, it was Dr. Chuang's responsibility to coordinate all that care. And when it came to Dr. Kim, Dr. Chuang, and the other doctor whose name is escaping me right now, I apologize. All of them said, had we been told earlier by the nurses about Scott's deteriorating condition, what would they have done? They would have consulted with Dr. Bagan because he was the ultimate decision maker. What did Dr. Bagan say? Nothing they told me was going to change my mind that Scott was stable and the surgery should go no earlier than Monday afternoon. So that's a dead end for the plaintiffs. I have a question. What responsibility, if any, did the OR have for ensuring that at 1 o'clock on Monday, that the proper equipment and medication was there ready for the doctor to proceed with the, we call this an operation or procedure? Sure. The insertion of the new pump. Right. The OR nurses are the intermediaries. They can only act on the orders. I'm talking about the OR as a, you know, not limited into the nurses, but whoever is responsible for operating that OR room. Sure. They're all intermediaries. Dr. Bagan, if I can borrow plaintiff's analogy from their brief, they said that they analogized this to a symphony or an orchestra, and they said that the hospital was the conductor.  Dr. Bagan was the conductor. He owned the orchestra hall. And so the responsibility of all of the OR staff was to have in place everything that, in this case, Dr. Bagan, the controlling neurosurgeon, told him he needed. All he said was that he needed a baclofen kit. He didn't say that he needed this incredibly rare 2,000-microgram concentration of baclofen. He never told them that. Well, wait a minute. They knew that this procedure, this operation, whatever you want to call it, was to replace the pump. And Dr. Justice Smith's point was, when you're replacing a pump, there should be a checklist someplace that says, oh, on the rare occasions that you have to replace a pump, here's what you need. You need 2,000 milligrams of this baclofen. You need the pump itself. Get yourself ready. So the minute he ordered the surgery to replace the pump, I think going to Justice Collins' question, the operating room, which you're saying, oh, the hospital just owns the hall. No, no, no. The hospital is responsible for the operating room and what procedures the operating room is going to follow. So why isn't there a checklist on the wall? Check. We've got the 2,000 milligrams of baclofen. Check. We've got the pump. Check. We've got this. Check. We've got that. That's what I don't understand. They knew that it was to replace a pump. There was no question about that. And they knew that they were planning to do that at 1 o'clock. Then they found out this cascading series of horrible events. The baclofen wasn't available. The pump wasn't available. They sent a messenger service instead of a guy in a car to go get it. All of that. But where's the checklist on the wall for this specific kind of surgery that they knew they had to do at 1 o'clock in the afternoon? Well, if I can answer your question with a rhetorical question, where was the indication that the doctor needed the 2,000 microgram concentration? Well, put this question back on me. I'm not, Your Honor. The indication was that at 1 o'clock in the afternoon, he's doing this procedure to replace the pump. Yes. Yes. Okay. My question is, where is the checklist for that kind of procedure? Like, if you had a checklist for a hernia operation or a checklist for, I don't know, ovarian cancer or whatever else. There's a checklist. These are the things we have to do if the surgery is ordered. Once the surgery is ordered, check, check, check, check, check. That, to me, is the responsibility of the hospital and the hospital's management of its own operating room. It manages the lights, it manages the equipment, it orders the knives, it orders the sponges, blah, blah, blah. It's responsible for the operating room. They don't contract the operating room out at noon time. They have to do this? They don't, Your Honor. It's okay. Okay. The operating room is not an independent contractor. It belongs to and is in control by advocates. Yes? Yes. Okay. So they get this order for the surgery at 1 o'clock and suddenly all things should start to go into motion. Yes. Why didn't they? You're telling me because the doctor didn't give them the checklist? And I'm saying, and I think Justice Smith and Justice Kotlin are also questioning, why wasn't the checklist already there? Wasn't it? There's no evidence in this record that there wasn't a checklist there. Well, it wasn't followed. If it was there, it wasn't followed because the backlog wasn't there. Your Honor, that's speculation. There's no evidence to support that point. Well, there is evidence to support that the backlog wasn't there. The backlog wasn't there. That's the logical fallacy that the plaintiffs want you to buy into. Look, this was an add-on procedure, meaning it had the lowest priority. It had seven exclamation points. Yes, I understand that, Your Honor. But your understanding of seven exclamation points must be different than mine. Your Honor, there's no evidence that there wasn't some kind of checklist. Their own expert on institutional negligence, Dr. Petra Faisett, didn't have any criticism of the hospital's policies and procedures, which would presumably encompass your question about why wasn't there a checklist. There's no evidence that there wasn't a checklist, and if there wasn't a checklist, their expert didn't seem to have a problem with it. Well, okay. You've got a hospital. It's responsible for the operating room. It gets noticed that they're doing this pump replacement. It knows that they need the pump. Yes. The pump. Is the doctor supposed to go get the pump? Who's going to go get the pump? I think focusing on the pump, and I'm happy to do it. I promise I will answer that question, but I'd be remiss if I didn't say that focusing on the pump would be more than a little bit unfair, because during the instruction conference, the plaintiff's counsel specifically told the trial court, we're not basing any part of our claim on the failure of the pump to be there at 1 rather than 1.30. That's irrelevant to our theory of the case. Having said that, this was an add-on surgery, and I think it's really important to appreciate what that means. That means it has lowest priority. It would be prepared last. And with a bunch of exclamation points. Yes, but he didn't. The hospital carried. Okay, let's say you're a nurse. Let me get into this hypothetical, your hypothetical a little bit. Let's say you're an OR nurse or OR staff. You see this pick list from Dr. Bagan. You say, okay, we need a baclofen kit. That's all he said with the exclamation points. All right. Well, the Medtronic, we know the Medtronic rep at 1 o'clock is going to be bringing the pump here, so we have that. And we have baclofen in stock. We have plenty of baclofen in stock. We have the concentration that we use very frequently at 500 micrograms. What notice, what warning did Dr. Bagan, who was the only person who could order medication, give them that they needed this once a year? Dr. Seno gave it to him on the Friday night, and it was given to the emergency room, both nurse and doctor. So it should have been conveyed off of a pick list down the chain. It wasn't, which shows a lack of a chain, which shows what we're trying to say, that the hospital didn't have a system in place to deal with that operation. And they admitted they didn't have doctors qualified to deal with it. Your Honor, there's nothing to support that. It's in the record. It is not in the record, sir. One of the doctors admitted it in the record. He was not trained in baclofen. And the nurse did too. There was no negligence. The nurse had to go and teach herself. Your Honor, now you're criticizing the hospital for a claim that the plaintiff didn't bring. There's no negligent credentialing claim here. And all the doctors were qualified and had experience with withdrawal symptoms and how to treat that. This was just that. Go through the list of all the withdrawal symptoms that plaintiff lists in his brief for baclofen withdrawal. They're the same withdrawal symptoms that you'll find from someone withdrawing from any other drug. So they had experience with this. The fact that they didn't have a lot of experience with baclofen withdrawal specifically, that's not relevant. Again, there was no negligent credentialing claim here. There was a system in place. I have to resist all of these assertions otherwise. There absolutely was a system in place for scheduling this and for dealing with this. Dr. Seno may have sent that fax, but he had no power, and no one criticized the fact that he had no power, to order the medication at Advocate Condell. Only Dr. Bagan could do that. It was Dr. Bagan's responsibility to look at that fax, to find it in the medical record, and to say, this is the concentration I need. He didn't do that. Was there anything that stopped any nurse, any intern, any extern, any resident, any other doctor, anybody else in the whole world, at that hospital, looking at that fax to say, hey, what about this 2,000 milligrams? You're calling it micrograms. I'm calling it milligrams. I'm not sure what you did. Was there anything that stopped any of them saying, there's an anomaly here. I need it cleared up? No. Are they trained, when they see something that's odd, to ask a question? There wasn't any testimony on that either way, so I'd be speculating. Thank you. What we know is that it was Dr. Bagan's responsibility to order the medication, to tell them what the medication was. And only he could order the medication. You can't have OR nurses ordering medication. I was asking whether or not they could ask a question. Like, no, there's a problem here. I see one thing, and then I see something else. Can you tell me which is the right one? Dr. Bagan came to the OR at 1 o'clock. He was told that the pump and the medication wasn't ready. At that point, he did not say, okay, well, I need this 2,000-microgram concentration. Please hurry it up. 1.30, same thing. He had every opportunity to tell them multiple times, and he didn't do it. All of these questions seem to be blaming everyone but the decision-maker here. And I think that's where the argument falls apart, Plaintiff's argument. You see, I look at the doctor. He tried to cover it because he knew he was going to get sued. So he backtracked. That's why he was so vague and ambiguous half the time. I mean, I'd be doing the same thing. But anyway, that's not relevant. I had to talk to them. I take your point, Your Honor, if I may just very briefly respond to it. That may well be the case, but presumably if it was, he would have said, yeah, you know what? If the nurses communicated this to me earlier on Sunday, it would have changed my decision-making. He dug in his heels and said at least five times it didn't. So I don't think that the record necessarily bears that out about Dr. Reagan. The testimony that he gave was not in his best interest by any means. Any further questions? Okay, Mr. Reagan, you may proceed. Thank you, Your Honor. May it please the Court, Mr. Amarillo. My name is Mike Reagan, and along with Tom Dimitrio, Mitchell Bild, and Mike Vittori, I represent Robin Wilcox, the executor of the estate of her deceased son, Scott Wilcox. Advocates' appeal is limited to very few arguments. It seeks drastic relief of the JNOV or a new trial based only on its claim of a complete inadequacy of evidence. The Court is well familiar with the high standards that must be met for both the JNOV or for a new trial, and there's no point in spending your time in doing that now. For both of those determinations, all of the evidence has to be viewed in the light most favorable to the plaintiff, and all inferences must be resolved in favor of the plaintiff. We're not here to simply argue the weight of the evidence. There is no claim of insufficiency of the evidence where trial error is made with respect to the vicarious liability or the nurse's count, other than the argument regarding approximate cause. There's a wisp of a single trial error on the institutional negative of the count, but it's really a throwaway argument which they reserved for last in their brief. If the Court, and this gets to the 1201 issue, if the Court finds in favor of the plaintiff on either of the counts, then with respect, the judgment is to be affirmed under section 5-2-1201D, because it requires that the verdict must be sustained if one count is error-free or, in the words of the statute, is sufficient to sustain the verdict. And we do not believe that there's even a colorable argument as to the insufficiency of the evidence on either count, but as long as one count is found to be properly affirmed, then any doubt as to the other count is irrelevant, and that is referenced in our brief, not by a statutory citation, but that concept is in footnote 5 on page 53. We make reference to that. Now, my experience with this Court has been that it would be well-steeped in the facts, and that is clearly borne out by the questioning of Mr. Amarillo this morning, and there's a lot about the facts that I would, and certainly my trial attorneys, would love to have me dig into, but there is a logical fallacy. There is a misrepresentation as to the law that's being made by advocate here, and with respect, I'd like to focus on that because the Court is well-versed in faxlery. It can fairly be said that the central element of the advocate's argument on the institutional negligence claim is advocate's position that there was no prior notice to advocate that its policies or standards have been violated, either before or during Scott's case, so that it was impossible, which is what they say, for advocate to enforce anything, and if that argument fails, then advocate's entire challenge to the substance of the institutional negligence count also fails. Now, I'd like to go briefly out of order in terms of my logical exposition here to take up Darling for a second, because this case is Darling in many ways. Darling was very interesting because it was a comprehensive appellate court opinion. The appellate court issued a certificate of importance to the Supreme Court, which this Court knows is seldom done, and Justice Walter Schaeffer wrote the opinion for the Supreme Court, and he was busy at the time earning for himself a nationwide reputation as to the quality of his opinions. Now, the counsel for the hospital told you that the concept of notice, or what the hospital should have known, was in the Darling opinion, and it supports the hospital's claim here that the hospital had to have known of a prior violation of something in order to be enforced, and he quoted a part of the Darling opinion, but the part he quoted doesn't support that at all. So the short paragraph in Darling says, In the present case, the regulations, standards, bylaws, which the plaintiff introduced into evidence, perform much the same function as did evidence of custom. Now, here comes the sentence that they rely upon, and you can see the context in which it appears. This evidence aided the jury in deciding what was feasible, here we go, and what the defendant knew or should have known. It did not conclusively determine the standard of care, and the jury was not instructed that it did. So Darling, the only place that it talks about what the hospital should have known, talks about it should have known the accrediting standards, its own policies, et cetera. That's what it should have known. It doesn't say anything about whether it had to have known that there was a prior violation. So if the court would indulge me for a minute, I can synthesize and demonstrate the logical failure of advocates' position. Advocates' primary defense with respect to the institutional negligence claim is to link together its assertions, and I quote, that knowledge and prior notice are requisites, end quote, if a hospital is to be held directly liable for failing to enforce its policies. That's even the caption in the first argument in their reply brief. Advocate amplifies that by saying that the plaintiff has never stated what advocates should have done differently, and we'll come back to that, and the plaintiff does not contest that the hospital was unaware that violations were occurring during Scott's treatment. Advocates' position is indefensibly wrong. Advocates' negligent acts and omissions are delineated in detail in the jury instructions, which in turn are grounded on binding and uncontested national standards governing hospitals and also on advocates' own policies. And the evidence, and we're dealing here with evidence because of the nature of this appeal, abundantly supports the jury's conclusions that those standards and policies were violated by advocates. For purposes of institutional negligence, advocate is itself the tort teaser. Darling, which we've talked about, is the wellspring of the law in Illinois on this and in much of the rest of the country for the recognition that, quote, present day hospitals do far more than furnish facilities for treatment. In the words of advocates' counsel, this is not the orchestra hall. It is not bricks and mortars of a hospital building, which long, long ago used to be the algorithm, but that's not true. And a patient who comes to a hospital, in the words of Darling, expects that the hospital will attempt to cure him, not merely that the nurses and staff will act on their own. The hospital itself owes a duty to the plaintiff to exercise reasonable care in light of the apparent risk of the particular patient's condition. And that's important, too. The hospital itself is supposed to know why the patient is there and what has to be done. And the essence of this institutional negligence claim here is that advocate itself violated its responsibilities under the Joint Commission standards and under its own procedures and set out in the instructions without any obligations. Scott's needs and risks were abundantly clear. He needed to have his non-functioning pump replaced in timely fashion so that he would receive the intrathecal baclofen to prevent the severe withdrawal symptoms, which were sure to follow that pump failure. He and his family told everyone of that need. This is a remarkably poignant and sad case because of the knowledge, the hard-earned, difficult knowledge that both Plaintiff Scott and his family knew. They were smart people. They were articulate people. They would tell anybody who listened, things are getting worse. We're having a problem. This has to be done. We need to get it done. The consequences of advocate's own failure to meet that need of the patient were ultimately deadly. The IPI issues instruction given here properly stated that a negligence by a hospital is the failure to do something that a reasonably careful hospital would do or the failure to do something that a reasonably careful hospital would do, and that the jury is to consider professional standards, bylaws, and expert testimony in making those determinations. The Joint Commission standards, and they're not only the gold standard, they are the binding standard, if you will, required that advocate itself coordinate the patient's care and treatment based on the patient's needs and to do that, quote, within a timeframe that meets the patient's needs. That is, not meeting the timeframe here is what killed Scott. Advocate is also required by those standards to effectively manage his program, services, and departments. Each of those national standards was violated by the hospital itself. We're not talking about something that a doctor did here. We're talking about what the hospital didn't do. Treatment was not coordinated among the nurses. One did not talk to the other. It has been talked about and alluded to in the court's questioning already. The OR staff, the physicians in the pharmacy, there has to be collaboration. There has to be communication. There has to be coordination. The defendant's own expert defined a system that same way, says that has to happen. And, of course, the evidence here is that it wasn't. And Dr. Hyde, who was the defendant's expert on this, when asked open-ended direct questions, show us, please, tell us, please, about the coordination, the communication here, et cetera, he said, I can't do that. It's graphic. Advocate itself did not effectively manage its departments, its emergency department, its nursing staff, its pharmacy or the OR, and that resulted in an inability to perform the surgery. When the patient and the surgeon were in the OR suite expecting, desperately needing it to happen, that was at 1 o'clock, the time at which Advocate said, we can do this surgery. And then, graphically, Grasso, the head of pharmacy, said, I didn't get a call, pharmacy didn't get a call requesting the baclofen until 1 o'clock, which was when Dr. Bagen is scrubbed in, when Scott's there, when the surgery was supposed to take place. All of Dr. Bagen's decision-making gets stripped out of the case in terms of you're having to look at this case, because the hospital said we could do this at 1 o'clock, Bagen said, fine, we'll do it at 1 o'clock, he's ready, the patient's ready, and it was only at 1 o'clock that the first call is made to try to line up the medicine that was needed. It is, there is no doubt, there is abundant testimony by the experts, by the hospital's own people, it is the responsibility of the hospital, at a minimum of the OR staff, in a broad general sense, to accumulate, to gather everything that is needed, and they have to do that in a professional manner. It's their job to put it together, and the record just clearly demonstrates that. There is, the advocate violated its procedures in not reporting these declining, graphically declining Scott's conditions to Dr. Bagen or to anybody else. Advocates, the declined Scott's condition was not conveyed by advocate personnel. The evidence here is that if Dr. Twang, who was the attending hospitalist, Samuels, who was the neurology consultant, and Ken Karcimas, the pain management physician, had been informed by advocate staff of Scott's increasingly dire withdrawal symptoms, that they would have taken their own actions, such as, and not just calling Dr. Bagen, I mean, they're trying to make, you know, all roads lead to Bagen, that's not this case at all. They said they would have taken their own actions, such as talking to each other or contacting Dr. Bagen, and they each graphically say, we were not notified, no nurse contacted us. Each was asked that question, and Dr. Bagen said that if he had been called by a medical professional on Sunday evening, medical professional, which he was not, and told of Scott's increased spasticity, labile blood pressures and heart rates and marked mental status changes, that he might have started the process earlier. And he said it is logical to conclude that then the effort to get the medicine, you know, the baclofen itself, would have started sooner also. And Dr. Grasso, excuse me, not Dr. Grasso, but the Grasso in pharmacy, was also taken through the backing up. She didn't get a call until 1 o'clock, the time of the surgery, which is obviously unexpected. She was asked, well, you know, it took four hours for the baclofen to get here. If we go back to 931, which was when the operative order was entered, would it have been here at 130? Yes. If it had been at 730 or so when the OR staff was told that there is going to be, you know, we could do this at 1 o'clock and let's do it, you could do it. You know, obviously you can add four hours to that. And if at 6 o'clock on Sunday evening there had been communication, then the jury can draw conclusions as to what might have happened then. The advocate says that we have not told them what they should have done differently. And the answer to that is that it violated the Joint Commission standards and its own procedures. And that's the answer grounded in the case law, the evidence and the jury instructions to that question as to what advocate quote should have done differently. It is advocates own failures, its own noncompliance with the Joint Commission standards and its own policies that it is immediately obvious that advocates other primary argument that it did not have prior notice that policy violations were occurring during Scott's treatment is completely groundless. Advocate cannot possibly be heard to say that it did not have notice of its own negligent acts of omissions. It's a non sequitur. It is a complete logical failure for advocate to argue that it must be shown to have had notice of its own actions. That is one of the holdings of Longnecker. And we think this case is controlled and very similar to Longnecker. And in Longnecker, the opinion written for this court by Justice Garcia said, quote, it is disingenuous for Loyola to suggest that it did not have, quote, notice that the doctor was not trained when Loyola itself trained him. Advocate here committed the offending actions. There can't be any greater notice than what it didn't do itself. Now, lastly, a separate but closely related and equally unavailing aspect of advocate's argument is advocates deliberately wrong mischaracterization of the nature of plaintiff's institutional negligence claim. At the outset of the reply brief, advocate writes that, quote, plaintiff simply claims that such knowledge is unnecessary and the hospital is negligent for permitting Scott's treaters to allegedly violate its policies. Now, they've adopted this. I think earlier we were accused of using a weasel word. This is their weasel word. They're talking about treaters and what they really mean is doctors. And that can be teased out of their brief as well. I'll tell you, it is only advocate who is blaming Scott's treaters, his doctors, in this context. Plaintiff does not. We're not pointing to Dr. We're not saying that the hospital should have known what Dr. might have been doing wrong. We're saying the hospital knew what it did not do itself, what it did wrong. And we're not blaming treaters. We're blaming the hospital, which is the nature of an institutional negligence claim. Court is respectfully asked to look at the citations to plaintiff's brief, which advocate cites to this court on page four of its reply brief. So page four of the reply brief, the advocate says, look, the plaintiff is blaming the treaters here. Cites pages 43, 44, 46, 47 of our brief. And when you read our brief at those pages, we've seen the advocate has completely misrepresented plaintiff's position. Plaintiff's institutional negligence claim is grounded on advocates own negligence, negligent violation of its binding policies and procedures. And it is not grounded on the actions of the treaters as advocate asked this court to believe as advocate today argued Dr. Began, Dr. Began, Dr. Began. And that is no part of our case. It's no part of our brief. And advocate has done that to divert the court's attention away from advocates failures here, which the court's questioning. All three of you have put in proper relief here and instead refers to this highly generic and very non-specific claim that the treaters did something wrong. It's not violations of policies by treaters, which are an issue here. It is advocates own violations of its policies and binding standards. And that's clear from the jury instructions. We've also made an argument concerning forfeiture of this entire argument. So you usually hear forfeiture at the beginning. But I mean, what we had to say about their lack of logic is so strong. We've brought it to here. In the reply brief, their response to our forfeiture argument is that a lack of notice is subsumed or included with, or everyone knows it's included with, management and administration. Before you can be accused of not managing something, you have to know that something's wrong. And that's not true. And I'll leave the forfeiture argument there. That is something clearly for the court to make its own decision about as to whether it was forfeited and if it was forfeited, what to do about it. On proximate cause. The proof of proximate cause for both of our claims, both for institutional negligence and for vicarious liability is overwhelming. But the strength of that proof is not the point. The controlling point is that advocate cannot be its burden to show either a total lack of such proof, or that the jury's findings of proximate cause for each of the counts was against the manifest weight of the evidence, or was clearly arbitrary, unreasonable, or was lacking completely. Scott died because advocate did not meet its duty to treat the sole condition which gave rise to his admission here, which was to monitor his withdrawal symptoms. That's why he's in a level one hospital. That's why he did not go to the hospital that was close to his home. He's very familiar with. But rather to go to a level one, where the OR, where the pharmacy, everything is open 24-7, and they can do this as needed. And of course, what he went to was a place where the nurses did not know what the withdrawal symptoms were, what had to be monitored, and one of the nurses, with due respect to the nurse, did not even know why he was in the hospital. Advocate assigned doctors and staff who had no experience with Scott's condition, and none of its staff made any effort to acquire the necessary knowledge to care for him. He died because of a stark lack of collaboration, communication, and coordination, and that violates the controlling national requirements and advocates' own policies. And Dr. Hyde, the defendant's own negligence, own expert in describing assistance, says those things had to exist, and I think this court knows on a factual basis they didn't. The jury rejected advocates' position on causation, just as they've argued today that it was all Dr. Bagan. They argued at trial. They argued in closing arguments that it was all Dr. Bagan. They requested and they received instructions on sole proximate cause that they wanted, and the court's probably familiar from other cases. There's this questioning going on right now, how do you instruct on proximate cause? It's not an issue here. The hospital wanted certain instructions. They got the instructions. The jury rejected their claim on sole proximate cause and decided in a highly specific verdict form, finding, expressly finding, in favor of the plaintiff on both the vicarious liability, finding in favor of the plaintiff on institutional negligence, and thereby necessarily rejecting the claim of sole proximate cause and necessarily finding that there was proximate cause, and the jury simply disagreed. On the vicarious liability claim, all of Scott's physicians testified that they would have reacted if they had been notified by the nurses. The nurses had a clear obligation to not only monitor but to report changing symptoms. They didn't do it. We've already talked, we've named the doctors who said they would have done something differently. They would have, if they were told, they weren't. Dr. Bagan himself said that if he had known of the symptoms earlier in the evening on Sunday, he would have started the process earlier. Let me just interject another note here, which is that Dr. Bagan, the things were so desperate for this family, that Jim Wilcox, the father, he himself called and left a message on the answering machine, said, you know, something has to happen here. Scott is in terrible condition. And that's the father call. And the questioning of Dr. Bagan is, well, what if a medical professional had called you? And I think we can all know, and certainly the jury was entitled to infer, it's one thing to hear from a patient, this is what I think, even though these patients were extraordinary, this family was extraordinary. But if you have another doctor calling you, if you have a nurse calling you, the jury is entitled to conclude that something would have occurred and what was supposed to happen didn't happen. On the institutional negligence claim with respect to the approximate cause, the failure to collaborate, communicate, and coordinate in a timeframe that met the patient's needs, and the failure to pay meaningful attention to this extremely knowledgeable patient and family, the failure to manage all the departments to fulfill the operating room's responsibility to gather everything, the failure of the pharmacy to, you know, more expeditiously get things, were pervasive from the Friday evening admission right through 1 o'clock, and, you know, thereafter, 1 o'clock, we're there, scrubbed in, the patient's there, the hospital said we can do it then, and they couldn't, and the first attempt to get the medicine was at 1 o'clock. Advocate has itself violated its own policies and the national standards. There is no dispute that if they had not, the surgery would have taken place when planned, Scott would still be with his family, and he would be living his productive life today. These are just some of the many pathways by which the jury could have concluded the approximate cause has been proven. The verdict on neither of the theories could be vacated for lack of proof, and if that is true as to even one of the counts, going back to the outset of this argument under 1201D, then the judgment with respect must be affirmed, and we respectfully ask that the judgment of the circuit court be affirmed. Thank you, Justice. I'm happy to entertain questions, and I've still left time. Any questions? I guess not. So, Jonathan, you can do your finale. Thank you, Justice. Let's keep in mind that police entire institutional negligence claim, the sum and substance of it is Dr. Petra faces testimony. Let me describe to you his testimony here. It made little sense. It was bizarre. It was ridiculous. It amounts to nothing. It was vague. It was non specific. It was word salad. Those are my opinions. The trial judge said that about his testimony. She was sitting right there. She listened to it closely. She said it's absolute bunk. Why she allowed it to go to the jury, I have no idea. She didn't explain it in her order denying her post trial motion or denying the directed verdict motion, but those are the only specific things she said about his testimony, and she said it's nonsense. My brother counsel talked about the case law. He and I read Darling very differently because when I read Darling, I see the court saying that they were applying ordinary negligence principles to hospitals, ordinary negligence principles. This is horn book law includes notice. It includes reasonable foreseeability. It's an unavoidable conclusion that that is part of the law. You don't have to take my word for it. Read this court's opinions in Essex, in Essex, in Reynolds, in Johnson, in Roe. They say that notice is an inextricable part of institutional negligence claims. I do not understand my brother counsel's statements that it could possibly be otherwise, unless we completely ignore all of that case law. Now, the plaintiff also said that advocate violated all the controlling standards. Your honors, she said that I heard that statement repeated many, many times. I didn't hear any specifics. Scratch half an inch beneath the surface of that allegation, and you'll see what they're complaining about in almost every instance is the actions of the treaters, the doctors, and the nurses, not of the hospital. And, you know, my brother counsel also said that Dr. Bacon's decision making was irrelevant because he was there at 1 o'clock and he was ready to operate. That ignores the fact that because of Dr. Bacon, the medication wasn't there at 1 o'clock. He was completely in charge of this process, and he did not create the conditions necessary to make that medication available at 1 o'clock. Regarding forfeiture, I'm a little surprised that the plaintiff's counsel is still pursuing that argument. Let me give you a few citations. The notice issue, quad notice, using that word, was discussed when advocate moved for a directed verdict. That's at page 1286 of the common law record. It was discussed, quad notice, during the jury instruction conference at page 957, 970, and 971 of the report of proceedings. It was discussed in the post-trial motion briefing. It was discussed at length at the post-trial motion hearing. We provide the sites for that in our appellate reply brief. That's at least four or five different instances where this issue was discussed, and somehow plaintiffs are sitting here and telling you that it wasn't. That is emblematic of how accurate their representations in their brief are of this record. Please check their citations. The questions I heard from this court indicated to me that you were relying on their factual representations in the appellate brief. I urge you to look them up yourself, as I know you will, and I know your clerks will. And when you do, you will see that there's no there there. They're using artful paraphrasing and very generous interpretation of the testimony to push their point. It's simply not accurate. Regarding my brother counsel's point that the jury rejected our proximate cause issue, yes, obviously. That's why we're here. That happens in every case where someone is arguing for a JNOV. That argued in the Supreme Court's decision that happened in the Supreme Court's decision in Snelson, which is directly on point. That didn't stop the Supreme Court from overturning the verdict. That's just an irrelevant truism. Regarding the sole proximate cause instruction, again, that misses the point. Our entire point here is that the hospital wasn't a proximate cause. I think what you'll find when you do look at those citations. Is that plaintiff's brief contains more adjectives and outrage than fair and accurate representations of the testimony and the evidence at trial. And I am sure that when you look for yourself, you will agree with us that a JNOV, or at the very least, a new trial is the only reasonable solution here. Unless the court is prepared to issue a decision radically expanding the claim of institutional negligence in Illinois. Thank you. Any questions? All right. Thank you both. The briefs were, how do I put it? They were actually interesting and enjoyable to read. So they were very well written. And I respect the way you both handled yourselves towards each other. It was very professional and interesting. And I see why the firms chose the two of you to argue these cases. You both did a very nice job. Two of the best I've seen. So thank you very much for your time and energy. Thank you, Rogers. Thank you.